The Honorable Lauren J. King

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

FANTAGRAPHICS BOOKS INC.,

       Plaintiff,

    v.

EMIL FERRIS,

       Defendant.

_____

EMIL FERRIS,

       Counterclaim Plaintiff,

    v.

FANTAGRAPHICS BOOKS, INC.,

       Counterclaim Defendant.

_____

) No. 2:21-cv-00802-LK
)
)
) FERRIS' MOTION FOR PARTIAL
) SUMMARY JUDGMENT
)
) NOTE ON MOTION CALENDAR:
) July 29, 2022
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

FERRIS' MOTION FOR PARTIAL
SUMMARY JUDGMENT - 1
No. 2:21-cv-00802-LK

**ATKINS IP**
113 Cherry Street #18483
Seattle, WA 98104-2205
(206) 628-0983

## INTRODUCTION

Plaintiff/counterclaim defendant Fantagraphics Books, Inc. ("Fantagraphics"), and defendant/counterclaim plaintiff Emil Ferris ("Ferris") filed competing claims seeking declaratory relief based on their Publishing Agreement. Fantagraphics claims that the Agreement gives it the right to publish, as volume two of a series, the remnant (approximately 233 pages) left over from the editing of a 600+ page manuscript that Ferris provided. Ferris claims that the Agreement, a fully integrated contract, negotiated at arm's length by the parties and their representatives, does not mention a second volume and, therefore, only grants Fantagraphics the right to publish the edited first book in the form that it has already published.

Both parties agree that the Publishing Agreement is unambiguous. Therefore, Ferris respectfully requests the Court interpret it as a matter of law and, in so doing, grant summary judgment on her counterclaim for declaratory judgment and dismiss Fantagraphics' opposing claim.

## FACTS

**A.**   **Background**

Emil Ferris is a formally trained artist and novelist, holding a Bachelors in Fine Arts and a Masters Degree in Writing from the Art Institute of Chicago. She lives and works in Evanston, Illinois. Among other work she does as an artist, for the past decade Ferris has worked on creating graphic novels, an art form that tells stories using both pictures and text, presented in a format similar to comic books, in that it includes pictures in panels, and accompanying text and dialogue, to tell a story in sequential order.[1]

---

[1] Decl. Emil Ferris in Supp. Mot. for Partial Sum. J. (filed herewith) ("Ferris Decl.") at ¶ 2.

FERRIS' MOTION FOR PARTIAL
SUMMARY JUDGMENT - 2
No. 2:21-cv-00802-LK

**ATKINS IP**
113 Cherry Street #18483
Seattle, WA 98104-2205
(206) 628-0983

In 2012, Ferris began work on a graphic novel telling the story of Karen, a ten-year old girl, who like Ferris grew up poor in Chicago in the 1960s.  The mysterious death of Anka, a beautiful young immigrant who lived upstairs, becomes a focal point in the complex tale.[2]

Unlike many graphic novels, which are created jointly by a writer and artist, and are aided by an inker, colorist and letterer, Ferris fulfills all these functions herself – she writes, illustrates, colors, and letters the entire work, everything the reader sees on the page.[3]

Ferris spent four years creating the 600+ page manuscript for the story she entitled *My Favorite Thing is Monsters* ("*Monsters*").  The manuscript introduces readers to an array of diverse characters who inhabit a world based on Ferris' life.  It is a universe of characters and stories that she intends to use as the base for a number of different books.  After Ferris finished the manuscript, which she knew would ultimately require additional editing, she engaged a literary agent, New York City based Holly Bemiss, to shop the manuscript to publishers who might be interested in publishing the work.  Fantagraphics, an independent publisher located in Seattle, expressed interest.[4]

Ferris worked with Bemiss in negotiating with Gary Groth, President of Fantagraphics, for the publication of *Monsters*.  The negotiations included two elements: 1) the length of *Monsters*, and 2) Fantagraphics' interest in acquiring the rights to the next installment of the story.[5]  Groth asserted that a 600+ page manuscript was too long to be commercially marketable. After some negotiation, Ferris agreed to edit the manuscript down to approximately 400 pages. This left approximately 230 pages unused in the book, which have come to be referred to as the

---

[2] *Id*. at ¶ 3.

[3] *Id*. at ¶ 4.

[4] *Id*. at ¶ 5.

[5] *Id*. at ¶ 6.

"remnant," or "remainder."  Like pieces of film that are edited and land on the cutting room floor, Ferris never intended to use the remnant as the principal source for the next installment of *Monsters*, which she started working on before the first book was published.[6]

Fantagraphics was also interested in acquiring the right to publish the next installment of the story of the characters in *Monsters*, and Groth, Bemiss, and Ferris began discussing that acquisition.  In this context, Groth asked Ferris if she could re-purpose any portion of the remnant in that next book.  Ferris told him that there were between 30 to 50 pages of material in the remnant that could possibly be used.  However, the 230 pages could not solve all the mysteries and tie up all the plot strings that remained in a way that would be nuanced and intelligent and answer a reader's curiosity in keeping with the first book.  Additional pages and a different narrative arc would be required.[7]

In editing down the length of *Monsters*, Ferris created a set of new pages that presented a different ending to the book than she had originally written.  The new ending is not in any way in alignment with the remnant, so Ferris believes that publishing the remnant as the next installment of the story would not make sense and would confuse readers.[8]

Although the parties had many discussions about the terms for publishing the second installment of the story, they never reached an agreement on those terms.[9]  Therefore, Ferris was not surprised when, in December 2015, Fantagraphics sent Bemis a Publishing Agreement for the right to publish, from the 600+ page manuscript, what would ultimately be the newly edited 400 page version of the manuscript as volume one of *Monsters*.[10]

---

[6] *Id*. at ¶ 7.

[7] *Id*. at ¶ 8.

[8] *Id*. at ¶ 9.

[9] *Id*. at ¶ 10.

[10] *Id*. at ¶ 11, Ex. A (the Publishing Agreement).

FERRIS' MOTION FOR PARTIAL
SUMMARY JUDGMENT - 4
No. 2:21-cv-00802-LK

**ATKINS IP**
113 Cherry Street #18483
Seattle, WA 98104-2205
(206) 628-0983

**B.**     **The Publishing Agreement**

On January 13, 2016, the parties entered into a six-page Publishing Agreement for *My Favorite Thing Is Monsters* ("Publishing Agreement").[11]   In it, Ferris (the defined "Author") granted Fantagraphics (the defined "Publisher") the exclusive right in specified countries to publish and license the publication of the "Work" in book form.[12]   The Publishing Agreement does not define "Work," but defines "Book" as "a compilation of the Work in book form currently titled *My Favorite Thing is Monsters*."[13]   In doing so, it uses "Book" and "a compilation" in the singular form.[14]   The Work referred to is the edited 400 page version of the Work that Fantagraphics accepted for publication and ultimately published.

Paragraph 2 of the Publishing Agreement states:

> Period of Agreement.  (a) The period of this Agreement shall commence on the date of the Agreement and continue as long as the book is in print, i.e., available from the Publisher in wholesale quantities.[15]

This provision further uses "book" in singular form.[16]

Paragraph 5 states:

> Delivery of The Work.  Required Delivery Date.  The Author agrees to deliver to the Publisher The Work to be included in the Book according to a mutually agreed upon schedule.  Delivery of repro proofs or digitized copies thereof will be deemed sufficient delivery.  The Publisher agrees to publish the Work within 24 months of the date of this Agreement.[17]

---

[11] *Id.*

[12] Publishing Agreement at ¶¶ 2-3.

[13] *Id.* at ¶ 1(a).

[14] *Id.*

[15] *Id.* at ¶ 2.

[16] *Id.*

[17] *Id.* at ¶ 5.

FERRIS' MOTION FOR PARTIAL
SUMMARY JUDGMENT - 5
No. 2:21-cv-00802-LK

**ATKINS IP**
113 Cherry Street #18483
Seattle, WA 98104-2205
(206) 628-0983

This provision again uses "Work" and "Book" in singular form.[18]

Subpart (c) of the "Miscellaneous" provision states that the Publishing Agreement cannot be modified unless done so in a writing signed by both parties:

> Modifications of Agreement; Remedies.  No waiver or modification of any of the terms of this Agreement shall be valid unless in writing, signed by both parties. …[19]

Subpart (e) contains an integration clause.  It states:

> Entire understanding.  This Agreement contains the entire understanding of the parties with respect to its subject matter.  Any and all representations or agreements by any agent or representative of either party to the contrary shall be of no effect.[20]

Subpart (f) states that Washington law governs:

> Choice of Law.  This Agreement and all disputes arising from or related to this Agreement or its subject matter shall be governed, resolved, and remedied in accordance with the laws of the State of Washington, applicable to agreements, acts, omissions, and behavior made, performed, and accomplished wholly in Washington, without resort to conflict of law principles.[21]

Importantly, the Publishing Agreement does not mention any rights to a second book, remnant, sequel, or next installment of *Monsters*.[22]

## C.   Publication of *My Favorite Thing Is Monsters*

Fantagraphics published *Monsters* on February 14, 2017.  The book was a huge and immediate success.  Ferris was honored with awards at the San Diego International Comic-Con convention and at the well-regarded Angoulême International Comics Festival.[23]

---

[18] *Id.*

[19] *Id.* at "Miscellaneous" (at ¶ (c)).

[20] *Id.* at ¶ (e).

[21] *Id.* at ¶ (f).

[22] *See* Publishing Agreement; Ferris Decl. at ¶ 11.

[23] Ferris Decl. at ¶ 12.

FERRIS' MOTION FOR PARTIAL
SUMMARY JUDGMENT - 6
No. 2:21-cv-00802-LK

After *Monsters* was published, Ferris went back to work on the next installment of the story. Fantagraphics pressured her to complete that second installment, hoping to capitalize on the success of *Monsters* by quickly bringing it to market. It pressed her to meet several different deadlines, which she was unable to fulfill because at the same time, Fantagraphics insisted that she travel the world to attend book signings and comic conventions to help promote the book – which she did, making over 20 such exhausting promotional trips shortly after the book came out.[24]

Over the next two years, Ferris started receiving royalty statements and payments from Fantagraphics based on sales of *Monsters*. She noted an odd trend – payments from European sales were high, in the mid-six-figures range, and yet U.S. sales were much lower, in the low five-figures range. Concerned that sales and payments were being under-reported, Ferris requested an audit of Fantagraphics' books of account, as was her right in the Publishing Agreement.[25]

Fantagraphics resisted the audit, insisting on a broad protective order, which forced Ferris to retain counsel to complete the audit. As Ferris understands it, an exchange between her counsel and Fantagraphics, in which her counsel reminded Fantagraphics that the Publishing Agreement did not give it any rights to another installment, led Fantagraphics to file suit.[26]

**D.    Procedural History**

On June 13, 2021, Fantagraphics filed the instant lawsuit against Ferris seeking a declaratory judgment that it has the right to publish a "Book 2" consisting of the "second half" of the manuscript that Farris had submitted.[27] The Complaint essentially concedes that negotiations

---

[24] *Id*. at ¶ 13.

[25] *Id*. at ¶ 14.

[26] *Id*. at ¶ 15.

[27] Complaint for Declaratory Judgment (Dkt. #2) ("Complaint") at ¶ 33.

FERRIS' MOTION FOR PARTIAL
SUMMARY JUDGMENT - 7
No. 2:21-cv-00802-LK

**ATKINS IP**
113 Cherry Street #18483
Seattle, WA 98104-2205
(206) 628-0983

for a second book were unsuccessful, so Fantagraphics is instead taking the position that it has the right to publish the remnant as a new installment in the *Monsters* story.

Among other things, the Complaint states: "Fantagraphics maintains that there is nothing 'ambiguous' about the Publishing Agreement, including with respect to the work to be published pursuant to it."[28]

On June 14, 2021, the case was assigned to the Honorable John C. Coughenour.[29]

On August 23, 2021, Ferris filed an answer denying Fantagraphics' claim for declaratory judgment.[30]  She also asserted counterclaims for breach of contract for failing to pay her according to the terms of the Publishing Agreement and for breach of the covenant of good faith and fair dealing (claims that are not part of this motion), and for a declaratory judgment clarifying that the Agreement gives Fantagraphics no right to publish anything that she has written other than *Monsters* – the book it has already published.

On December 14, 2021, Judge Coughenour issued a Civil Trial Scheduling Order.  In it, he set June 6, 2022, as the discovery cutoff date; July 5, 2022, as the dispositive motion deadline; and October 3, 2022, as the trial date.[31]

On December 21, 2021, the case was reassigned to the Honorable Lauren King.[32]

On April 5, 2022, Judge King issued an Order Resetting Trial Date and Related Pretrial Dates.  In doing so, she reset the trial date to October 31, 2022.  The Order kept July 5, 2022, as the dispositive motion deadline, and did not change the discovery cutoff date.  The Order added:

---

[28] *Id.* at ¶ 12.

[29] *See* docket.

[30] Answer to Pl.'s Complaint for Declaratory Judgment; Counterclaims for Breach of Contract and Declaratory Judgment (Dkt. #15) ("Counterclaims").

[31] Civil Trial Scheduling Order (Dkt. #21).

[32] *See* docket.

FERRIS' MOTION FOR PARTIAL
SUMMARY JUDGMENT - 8
No. 2:21-cv-00802-LK

> The dates set forth in this order are firm dates that can be changed only by order of the Court, not by agreement of counsel for the parties.  The Court will alter these dates only upon good cause shown.  Failure to complete discovery within the time allowed is not recognized as good cause.[33]

Guided by her counsel, over the past several months, Ferris participated in discussions aimed at attempting to settle the case.  The negotiations focused on terms for publishing a new, original manuscript for the next installment of *Monsters*.  The parties never discussed the idea of publishing the remnant as the next book, and Ferris would never agree to do that.  Once the book was created – at Fantagraphics' behest – what was left was no longer usable as the basis for the next work in the series.[34]

The cost of this litigation has been extremely stressful for Ferris, and has required her to take on extra art commissions to pay her legal fees.  Throughout settlement negotiations, counsel for Fantagraphics repeatedly warned that if Ferris didn't agree to its terms, the costly litigation would be resumed.  That threat recently led Ferris to engage less expensive counsel.[35]

Fantagraphics' threat, via this lawsuit, to publish the remnant unless Ferris agrees to onerous terms that would compel her to finish work on the second book on a schedule that Fantagraphics dictates, is deeply concerning to Ferris.  She fears that publication of the remnant under a title of Volume 2 of *Monsters* would be disappointing to her fans, would damage her professional reputation, and would harm prospects for future books in her planned series.[36]

---

[33] Order Resetting Trial Date and Related Pretrial Deadlines (Dkt. #25).

[34] Ferris Decl. at ¶ 16.

[35] *Id*. at ¶ 17.

[36] *Id*. at ¶ 18.

FERRIS' MOTION FOR PARTIAL
SUMMARY JUDGMENT - 9
No. 2:21-cv-00802-LK

1

## ARGUMENT

The Court should grant Ferris summary judgement on the parties' competing claims for declaratory relief because the plain terms of the fully integrated, unambiguous Publishing Agreement do not grant Fantagraphics the right to publish anything other than the *Monsters* book that it has already published.

### A.    Standards for Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court does not make credibility determinations or weigh the evidence at this stage.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The sole inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251-52.  To the extent that the Court resolves factual issues in favor of the nonmoving party, this is true "only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied."  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

The Court will, however, enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Once the moving party has carried its burden under Rule 56(c), "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis omitted).  Metaphysical doubt is insufficient, *id.* at 586, as are conclusory, non-specific affidavits, *Lujan*, 497 U.S. at 888-89.

**ATKINS IP**
113 Cherry Street #18483
Seattle, WA 98104-2205
(206) 628-0983

"Interpretation of an unambiguous contract is a question of law." *Orbridge LLC v. Safari Legacy, Inc.*, No. 3:20-CV-6259-BJR, 2021 WL 3269599, at *4 (W.D. Wash. July 30, 2021) (granting summary judgment on contract claim) (quoting *Mayer v. Pierce County Medical Bureau, Inc.*, 80 Wn. App. 416, 420 (1995)).  "If a contract is unambiguous, summary judgment is proper[.]"  *Id.* (bracket in original) (quoting *Voorde Poorte v. Evans*, 66 Wn. App. 358, 362 (1992)).  "If a contract is unambiguous, or its language, in context, has but one reasonable meaning, a court may grant summary judgment even if the parties dispute the legal effect of a term or provision."  *Mayer*, 80 Wn. App. at 420 (citing *Voorde Poorte*, 66 Wn. App. at 362).

As discussed below, the parties' Publishing Agreement is unambiguous.  Therefore, the Court should interpret it as a matter of law.

**B.**     **The Publishing Agreement Is Unambiguously Limited to the Book that Fantagraphics Published.  Therefore, the Court Should Conclude as a Matter of Law that Fantagraphics' Rights are Limited to that Book.**

Because the Publishing Agreement is unambiguously limited to *Monsters* – the book that Fantagraphics has already published – the Court should conclude as a matter of law that Fantagraphics' rights are limited to that book.

The Publishing Agreement provides that its interpretation shall be governed by Washington law.[37]  Washington follows the "objective manifestation" theory of contracts. *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wash.2d 493, 503 (2005) (*en banc*).  Under this theory, Washington courts "attempt to determine the parties' intent by focusing on the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties." *Id.* (citation omitted).  Washington courts "impute an intention corresponding to the reasonable meaning of the words used."  *Id.* (citation omitted).  "[T]he subjective intent of the parties is generally irrelevant if the intent can be determined from the actual words used."  *Id.* at 503-04

---

[37] Publishing Agreement at "Miscellaneous" (at ¶ (f)).

FERRIS' MOTION FOR PARTIAL
SUMMARY JUDGMENT - 11
No. 2:21-cv-00802-LK

**ATKINS IP**
113 Cherry Street #18483
Seattle, WA 98104-2205
(206) 628-0983

1    (citation omitted).  Courts "generally give words in a contract their ordinary, usual, and popular

2    meaning unless the entirety of the agreement clearly demonstrates a contrary intent."  *Id.* at 504

3    (citation omitted).  They "do not interpret what was intended to be written but what was written."

4    *Id.* (citations omitted).

5           For this reason, "extrinsic evidence may not be used to "'show an intention independent

6    of the [contract]' or to 'vary, contradict[,] or modify the written word.'"  *Phytelligence, Inc. v.*

7    *Washington State Univ.*, No. C18-405-RSM, 2019 WL 2491911, at *4 (W.D. Wash. June 14,

8    2019) (excluding on summary judgment plaintiff's extrinsic evidence offered in support of its

9    contract claim) (brackets in original; quoting *Hearst*, 154 Wn.2d at 503) (quoting *Hollis v.*

10   *Garwall, Inc.*, 137 Wn.2d 683, 695 (1999)), *aff'd,* 973 F.3d 1354 (Fed. Cir. 2020).

11          Here, the parties' "objective manifestations" are clear.  The Publishing Agreement grants

12   Fantagraphics the right to publish and to license the publication of one "Book" (singular), which

13   the Agreement defines as a "compilation" (singular) of the "Work" (singular) in book form; the

14   title of the Book is *My Favorite Thing Is Monsters*; and it is undisputed that Fantagraphics has

15   already published *My Favorite Thing Is Monsters*.  Notably, the Publishing Agreement does not

16   say that Ferris grants Fantagraphics the right to publish "Books" (plural); "compilations" (plural)

17   of the Work; a series of "Works" (plural); or a remnant of the work that was cut from the

18   published book.  Imputing the "intention corresponding to the reasonable meaning of the words

19   used" in the Publishing Agreement, the parties only intended for Fantagraphics to publish the

20   one book that it's already published.  *Hearst Commc'ns, Inc.*, 154 Wash.2d at 503.  Therefore,

21   the Court should give effect to those words.  *Id.* at 504.

22          Because the Publishing Agreement contains everything needed for the Court to interpret

23   it, the Court need not – and should not – look to extrinsic evidence.  That Fantagraphics affixed

24   "BOOK ONE" to the spine of the *Monsters* print edition, told licensees that it would provide a

25   second book, or had the subjective belief that it had the right to publish the remnant pages that

26

FERRIS' MOTION FOR PARTIAL
SUMMARY JUDGMENT - 12
No. 2:21-cv-00802-LK

**ATKINS IP**
113 Cherry Street #18483
Seattle, WA 98104-2205
(206) 628-0983

Ferris cut from *Monsters* is irrelevant.[38]  Under *Hearst*, since none of these things were part of the Publishing Agreement, they cannot be used to divine the parties' intent beyond the plain terms that they agreed to in that Agreement.  *See id.* at 503-04.  As the Washington Supreme Court put it, "the subjective intent of the parties is generally irrelevant if the intent can be determined from the actual words used."  *Id.*  Since Washington courts "do not interpret what was intended to be written but what was written," the Court's inquiry should start and end with the plain terms written in the Publishing Agreement.  *Id.* at 504.

Indeed, the parol evidence rule bars extrinsic evidence even apart from *Hearst*.  If a written contract is fully integrated, extrinsic evidence is not admissible under the parol evidence rule to add to or vary the contract's terms.  *Hulbert v. Port of Everett*, 159 Wn. App. 389, 400 (2011).  *See also*, *United States for use & benefit of ThyssenKrupp Elevator Corp. v. Guarantee Co. of N. Am. USA*, No. C20-1169-MLP, 2021 WL 1964302, at *5 (W.D. Wash. May 17, 2021) (citing *Hulbert*, 159 Wash. App. at 400); *FMC Techs., Inc. v. Edwards*, No. C05-946-C, 2007 WL 1725098, at *4 (W.D. Wash. June 12, 2007) ("'[A]n integration clause prevents a party to a contract from basing a claim of breach . . . on agreements or understandings, whether oral or written' that were part of negotiations but which never were written into the contract itself.") (quoting *Vigortone AG Prods., Inc. v. PM AG Prods., Inc.,* 316 F.3d 641, 644 (7th Cir. 2003), *aff'd,* 302 F. App'x 577 (9th Cir. 2008).  In this way, an integration clause limits "the evidence available to the parties should a dispute arise over the meaning of the contract. . . .").  *Fairhaven Health, LLC v. BioOrigyn, LLC*, No. 2:19-CV-01860-RAJ, 2020 WL 5630473, at *7 (W.D. Wash. Sept. 21, 2020) (quoting *FMC Techs., Inc.*, 2007 WL 1725098, at *4).

---

[38] *See, e.g.*, Complaint at ¶¶ 10-11, 13-14, 19-20, 29.

FERRIS' MOTION FOR PARTIAL
SUMMARY JUDGMENT - 13
No. 2:21-cv-00802-LK

**ATKINS IP**
113 Cherry Street #18483
Seattle, WA 98104-2205
(206) 628-0983

Here, there can be no dispute that the Publishing Agreement is fully integrated.  Not only does it provide all the essential terms under which the parties have operated for 5+ years, it expressly states that it reflects the parties' entire understanding:

> Entire Understanding.  This Agreement contains the entire understanding of the parties with respect to its subject matter.  Any and all representations or agreements by any agent or representative of either party to the contrary shall be of no effect.[39]

The Publishing Agreement further states: "No waiver or modification of any of the terms of this Agreement shall be valid unless in writing, signed by both parties."[40]  Taken together, these terms express the parties' clear intent that the Publishing Agreement reflects their entire agreement as to Fantagraphics' right to publish *Monsters*.

Since the Agreement is fully integrated, the Court should not consider any evidence that Fantagraphics may offer in opposition to this motion that changes its plain terms.  *See Hulbert*, 159 Wn. App. at 400.  Simply put, the Publishing Agreement speaks for itself.  To use its language, "[a]ny and all representations or agreements by any agent or representative of either party to the contrary shall be of no effect."[41]  As with *Hearst*, the parol evidence rule excludes all evidence of supposed agreements that were never written into the Agreement.  *See FMC Techs.*, 2007 WL 1725098, at *4 (quoting *Vigortone AG Prods., Inc.*, 316 F.3d at 644.  Therefore, the Court should not consider such evidence in opposition to this motion.

## C.    **Fantagraphics Admits that the Publishing Agreement Is Unambiguous.**

Fantagraphics helpfully admits in its Complaint that the Publishing Agreement is unambiguous.  This, too, supports the conclusion that the Court should interpret it as a matter of law.  *See Mayer*, 80 Wn. App. at 420 (citing *Voorde Poorte*, 66 Wn. App. at 362).

---

[39] Publishing Agreement at Miscellaneous (at ¶ (e)).

[40] *Id*. at ¶ (c).

[41] *Id*. at ¶ (e).

FERRIS' MOTION FOR PARTIAL
SUMMARY JUDGMENT - 14
No. 2:21-cv-00802-LK

"A statement in a complaint, answer or pretrial order is a judicial admission." *DZ Bank AG Deutsche Zentral-Genossenschaftsbank v. Connect Ins. Agency, Inc.*, No. C14-5880-JLR, 2016 WL 631574, at *10 (W.D. Wash. Feb. 16, 2016) (quoting *Am. Title Ins. Co. v. Lacelaw Corp.,* 861 F.2d 224, 226 (9th Cir. 1988)).  *See also*, *Hakopian v. Mukasey,* 551 F.3d 843, 846 (9th Cir. 2008) ("Allegations in a complaint are considered judicial admissions.").  Under federal law, "stipulations and admissions in the pleadings are generally binding on the parties and the Court."  *PTP OneClick, LLC v. Avalara, Inc.*, No. C19-0640JLR, 2020 WL 4729174, at *7 (W.D. Wash. May 27, 2020) (quoting *Am. Title Ins. Co.*, 861 F.2d at 226).  "The general rule is that a party cannot create a triable issue by relying on a declaration that is inconsistent with the facts alleged in its complaint."  *Id*. (citations omitted) (concluding on summary judgment that the plaintiff's "judicial admissions in its complaint dispel any genuine material dispute on this issue").  *See also*, *Mecum v. Wells Fargo Bank, N.A.*, No. C15-1302-JLR, 2016 WL 3617847, at *1 n.2 (W.D. Wash. July 6, 2016) (concluding it was proper to decide the parties' cross-motions for summary judgment based on facts stated in the plaintiff's operative complaint).

Here, the Complaint states that "as far as Fantagraphics is aware the word and the concept of a 'sequel' to MONSTERS was never once used in any of the prior five-plus years of communications between the parties[;] and Fantagraphics never once expressed any interest or desire to publish a 'sequel' to MONSTERS.[42]  The Complaint further states that Fantagraphics "completely agree[s]" with the "factual and legal conclusion that '[t]he [Publishing] Agreement by its express terms pertains only to the Monsters book."[43]  The Complaint then crucially admits that "there is nothing 'ambiguous' about the Publishing Agreement, including with respect to the identification of the work to be published pursuant to it."[44]

---

[42] Complaint at ¶ 25.

[43] *Id*.

[44] Complaint at ¶ 12.

FERRIS' MOTION FOR PARTIAL
SUMMARY JUDGMENT - 15
No. 2:21-cv-00802-LK

**ATKINS IP**
113 Cherry Street #18483
Seattle, WA 98104-2205
(206) 628-0983

These admissions should end the inquiry.  Fantagraphics should not be heard to argue in response to this motion that there was a side agreement that bound Ferris to deliver a sequel; that the Publishing Agreement covers more than the *Monsters* book that it already published – including the remnant portion that was cut from the book; or that the Publishing Agreement is ambiguous on these points and, therefore, cannot be construed as a matter of law.  *See PTP OneClick, LLC*, 2020 WL 4729174, at *7 (quoting *Am. Title Ins. Co.*, 861 F.2d at 226); *Hakopian*, 551 F.3d at 846.  Fantagraphics is bound by its admissions.  It can't change its position now.

## CERTIFICATION

As discussed above, the parties have engaged in monthslong discussions in an effort to settle this dispute.  Ferris believes that these discussions, which included the parties' differing interpretations of the Publishing Agreement at issue in this motion, constitute the "meaningful effort to confer" that is required before filing this motion.  Of course, if Fantagraphics now agrees with Ferris' interpretation, Ferris would be willing to withdraw its motion as being moot.

## CONCLUSION

The Publishing Agreement, an unambiguous, fully-integrated contract, speaks for itself. Its plain terms are limited to the *Monsters* book that Fantagraphics has published.  The Court should not read into the Agreement additional or contrary terms that do not exist within the four corners of that Agreement.  As a consequence, it should dismiss as a matter of law Fantagraphics' claim for declaratory judgment that it is entitled to publish additional material, which depends on such additional and contrary terms.  It also should grant Ferris' opposing counterclaim for declaratory judgment, which rests squarely on the terms of the Agreement that the parties negotiated and signed.

**ATKINS IP**
113 Cherry Street #18483
Seattle, WA 98104-2205
(206) 628-0983

1    DATED this 5th day of July, 2022.

2                                              MARC GREENBERG, ATTORNEY AT LAW

3

4                                              By /s/ Marc Greenberg
                                                   Marc Greenberg
5                                                  Pro Hac Vice
                                                   Golden Gate University School of Law
6                                                  536 Mission Street
                                                   San Francisco, CA 94105-2968
7                                                  (415) 235-3352
                                                   *mhg@marcgreenberglaw.com*
8
                                               ATKINS INTELLECTUAL PROPERTY, PLLC
9

10                                             By /s/ Michael G. Atkins
                                                   Michael G. Atkins
11                                                 WSBA# 26026
                                                   Atkins Intellectual Property, PLLC
12                                                 113 Cherry Street #18483
                                                   Seattle, WA 98104-2205
13                                                 (206) 628-0983
                                                   *mike@atkinsip.com*
14
                                               Attorneys for Emil Ferris
15

16

17

18

19

20

21

22

23

24

25

26

FERRIS' MOTION FOR PARTIAL
SUMMARY JUDGMENT - 17
No. 2:21-cv-00802-LK

**ATKINS IP**
113 Cherry Street #18483
Seattle, WA 98104-2205
(206) 628-0983

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 5, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will automatically generate a Notice of Electronic Filing to all parties in the case who are registered users of the CM/ECF system

By /s/ Michael G. Atkins
Michael G. Atkins

FERRIS' MOTION FOR PARTIAL
SUMMARY JUDGMENT - 18
No. 2:21-cv-00802-LK