THE HONORABLE LAUREN KING

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
FANTAGRAPHICS BOOKS, INC.,

        Plaintiff,

   v.

EMIL FERRIS,

        Defendant
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
EMIL FERRIS,

        Counter-Claimant,

   v.

FANTAGRAPHICS BOOKS, INC.,

        Counter-Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

No. 2:21-cv-00802-LK

**FANTAGRAPHICS' OPPOSITION TO FERRIS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

**NOTE ON MOTION CALENDAR**
July 29, 2022

FANTAGRAPHICS' OPPOSITION TO FERRIS'
MOTION FOR PARTIAL SUMMARY JUDGMENT - 1
2:21-cv-00802-LK

*Endejan Law, LLC*
*5109 23rd Ave, W.*
*Everett, WA 98203*

**Preliminary Statement**

Plaintiff Fantagraphics Books, Inc. ("Fantagraphics"), a Seattle-based independent book publishing company, respectfully submits this Opposition to the motion of defendant Emil Ferris ("Ferris") for partial summary judgment dismissing as a matter of law Fantagraphics' claim for a declaratory judgment. As will be demonstrated below, Ferris' motion misunderstands and misstates a) the central issue to be decided on the motion; b) the law governing the adjudication of that central issue; and c) the crucial (undisputed) underlying (and here "extrinsic") facts.

Submitted with this Opposition is a 20-page, 67-paragraph declaration by Fantagraphics' Publisher Gary Groth ("Groth Dec.") that sets forth, mostly by directly quoting Ferris and her duly acknowledged and authorized agent Holly Bemiss ("Bemiss"), the "extrinsic facts" that <u>must</u> be considered in the adjudication of the motion. As will be demonstrated below, the law governing this motion -- primarily the very case Ferris' motion purports to rely on (<u>Hearst Communications, Inc. v. Seattle Times Co.</u>, 154 Wn.2d 493 (Sup. Ct 2005) ("<u>Hearst</u>") -- explicitly holds that where, as here, a motion requires the Court to interpret "as a matter of law" specific words in a contract, a) the motion can <u>only</u> be granted if the movant's proffered interpretation is "the only one reasonable interpretation" of those words and 2) the Court <u>must</u> consider "extrinsic evidence" in reaching that adjudication.

The sole subject of this action is a Publishing Agreement ("the Agreement") dated January 13, 2016 by which Ferris granted to Fantagraphics publishing and related rights to her work entitled MY FAVORITE THING IS MONSTERS (called there and here "the Work"). (A copy of that Agreement is annexed as Exhibit "A" to the Groth Declaration submitted herewith.) The heart -- the fulcrum -- of Ferris' motion is a single (defined therein) word in the Agreement -- the word "book." Ferris' motion is based entirely on its <u>ipse dixit</u> and entirely unsupported assumption that the word "book" can <u>only</u> mean "one volume" and that, as

| FANTAGRAPHICS' OPPOSITION TO FERRIS'<br>MOTION FOR PARTIAL SUMMARY JUDGMENT - 2<br>2:21-cv-00802-LK | *Endejan Law, LLC*<br>*5109 23rd Ave, W.*<br>*Everett, WA 98203* |
|---|---|

a- matter of law no less, there can be no such thing as a "book" that can be published in two or more volumes. Ferris' motion can only be granted if this Court finds "as a matter of law" -- after its mandatory consideration of the proffered "extrinsic evidence" -- that the "one only" reasonable interpretation of the word "book" in the Agreement must mean "in only one volume."

As will be demonstrated in full below, both Ferris herself and her agent repeatedly made clear that that was not their understanding of the meaning of that word. For one example: shortly after Bemiss submitted to Fantagraphics the entire very large book at issue in this case, she advised Fantagraphics: "[Ferris] is open to releasing this as one big book or two volumes. She has ideas as to how best to split the book, but does want to find an editor who really knows comics, and will be her guide.")[1] In short, Ferris' motion is utterly wrong as to both its sole predicate and on the law governing the adjudication of the motion.

Because to date Ferris has not produced in discovery a single document, and because she has refused to be deposed as duly noticed by Fantagraphics, Rule 56(f) would permit the Court to "continue" this motion pending discovery. However, Fantagraphics deems such a continuance unnecessary and it therefore does not request that one be ordered.

Further, Rule 56(b) provides that Fantagraphics can itself move for summary judgment on the issue presented by Ferris' motion. However, because Fantagraphics believes discovery should first be had to establish a fully-developed record, including especially directly from Ferris, it does not make any such motion now. Instead, in opposing Ferris' motion, Fantagraphics only requests that the motion be denied so that the parties can continue to litigate the case on the merits to its ultimate proper conclusion.

---

[1] Groth Dec., Paragraph 5.

FANTAGRAPHICS' OPPOSITION TO FERRIS'  
MOTION FOR PARTIAL SUMMARY JUDGMENT - 3  
2:21-cv-00802-LK

*Endejan Law, LLC*  
*5109 23rd Ave, W.*  
*Everett, WA 98203*

**The Central (Really Only) Issue on This Motion**

Bemiss, a professional literary agent, represented and spoke for Ferris throughout the negotiations leading to the Agreement and thereafter. (Ferris confirmed in writing that "[Bemiss] was the only person I've ever authorized to be my agent and in communication with [Fantagraphics] about my work.")[2]

Simultaneous with the execution of the Agreement, Bemiss, speaking and acting for Ferris and with the concurrence of Fantagraphics, prepared and issued a public announcement extolling the Agreement that is the subject of Ferris' motion ("the Bemiss Announcement").[3] That draft Announcement explicitly proclaimed the parties' joint understanding and intention with respect to the Agreement and, more specifically, how the Work would be published under it. That draft Announcement declared in its entirety (emphasis added):

> Gary Groth at Fantagraphics acquired world rights to <u>My Favorite Thing is Monsters</u>, by Emil Ferris. Drawn as the journal of a ten-year-old girl, the story follows her attempt to solve the mystery of the death of her beloved neighbor, a Holocaust survivor. Ferris's drawings reflect a world where the monstrous is beautiful, and where goodness is found in the most unlikely places. <u>The 600+ page, four color graphic novel will be published in 2 volumes, beginning in September 2016</u>. Holly Bemiss of the Susan Rabiner Literary Agency closed the deal.

Shortly thereafter, the trade publication <u>Publishers Marketplace</u>, the publishing industry's primary source for such announcements, prominently published this slightly-edited version of that draft[4]:

---

[2] Groth Dec., Paragraph 4.

[3] Bemiss wrote to Groth: "Hi Gary, here is the draft of the announcement. Look OK to you?" Groth responded that it did. Groth Dec,. Paragraph 9.

[4] Groth Dec., Paragraph 11.

FANTAGRAPHICS' OPPOSITION TO FERRIS'  
MOTION FOR PARTIAL SUMMARY JUDGMENT - 4  
2:21-cv-00802-LK

*Endejan Law, LLC*  
*5109 23rd Ave, W.*  
*Everett, WA 98203*

> **PublishersMarketplace Deal Report**
>
> Graphic Novel                                              March 3, 2016
>
> Emil Ferris's MY FAVORITE THING IS MONSTERS, drawn as the journal of a ten-year-old girl, the story follows her attempt to solve the mystery of the death of her beloved neighbor, a Holocaust survivor, the author's drawings reflect a world where the monstrous is beautiful, and where goodness is found in the most unlikely places, to be published in 2 volumes, beginning in September 2016, to Gary Groth at Fantagraphics, by Holly Bemiss (world).

Because Bemiss was Ferris' fully-disclosed and fully-authorized agent, that Announcement is fully binding on Ferris.[5] More importantly, Ferris has never made any attempt to disown or quarrel with anything in the Announcement and she actually admitted in her Answer that it "speaks for itself,"[6] which it obviously does. It is literally impossible to reconcile the Bemiss Announcement's "in 2 volumes" with the Ferris motion's predicate that the term "book" in the Agreement can only mean "in one volume."

Moreover, as further discussed below and in the accompanying Groth Declaration, in

---

5. See, e.g., Blake Sand & Gravel, Inc. v. Saxon, 98 Wn. App. 218, 223, 989 P. 2d 1178 (1999):"When an agent has actual authority to act on behalf of the principal, the agent's exercise of the authority binds the principal. [Citations omitted.] Actual authority is established based on the objective manifestations of the principal. [Citations omitted] "The manifestations to the agent can be made by the principal directly, or by any means intended to cause the agent to believe that he is authorized or which the principal should realize will cause such belief." RESTATEMENT, supra, § 26, cmt. b." "Under apparent authority, an agent … binds a principal … if objective manifestations of the principal 'cause the one claiming apparent authority to actually, or subjectively, believe that the agent has authority to act for the principal' and such belief is objectively reasonable.' [Citations omitted]"

6. Ferris Answer, Paragraph 9.

FANTAGRAPHICS' OPPOSITION TO FERRIS'  
MOTION FOR PARTIAL SUMMARY JUDGMENT - 5  
2:21-cv-00802-LK

*Endejan Law, LLC*  
*5109 23rd Ave, W.*  
*Everett, WA 98203*

word and deed Ferris and Bemiss repeatedly confirmed the proclamation in the Announcement that under "the deal" the Work "will be published in 2 volumes."  (Shortly before the Agreement was sent to Ferris for signature, in response to a question from Groth, Bemiss responded (all CAPS in the original): "OK. EMIL SAYS SHE CAN HAVE VOLUME ONE READY BY DECEMBER 31ST. VOLUME TWO BY APRIL 31ST [sic]."[7]

At the time the Agreement was signed, the title MY FAVORITE THING IS MONSTERS only referred to the single "600+ page, four color graphic novel" that Bemiss (as agent for Ferris) originally submitted in manuscript form to Fantagraphics in August 2015.  In fact, there is zero evidence that could even arguably refute that the reference to that title as "the Work" in the Publishing Agreement referred only to that entire "600+ page, four color graphic novel" and to no other version or variation thereof.

Although this is nowhere directly acknowledged much less addressed as such in Ferris' motion, the Agreement contains two "defined terms," the interpretation of the first presenting the central -- actually, only -- issue on this motion.  That definition -- those twenty words -- controls the interpretation of every other use of the word "book" in the Agreement.[8] Those twenty words are: "<u>The term 'Book' shall mean a compilation of the Work in book form currently titled *My Favorite Thing is Monsters*</u>."

---

[7] Groth Dec., Paragraph 8.

[8] "When the same word is used in different parts of a contract, it is presumed that the word means the same throughout." <u>Brighton v. Ballard</u>, 2002 Wash. App. LEXIS 235 at *7 (Ct. Ap. 2002), quoting <u>Bellevue School District v. Bentley</u>, 38 Wn. App. 152, 159, 684 P.2d 793 (1984).  "Where a contract defines a term, the contractual defined term controls over the common usage of the term" <u>Collins v. Nat'l Gen. Ins. Co.</u>, 334 F. Supp. 2d 632,638-39 (E.D. Mich. 2011); <u>Sylvester v. FCCI Ins. Co.</u>, 373 F. Supp. 857, 867 (E.D. Mich. 2019).

FANTAGRAPHICS' OPPOSITION TO FERRIS'
MOTION FOR PARTIAL SUMMARY JUDGMENT - 6
2:21-cv-00802-LK

*Endejan Law, LLC*
*5109 23rd Ave, W.*
*Everett, WA 98203*

As is readily apparent, that defined term does not include these three additional words: "in one volume," or for that matter "in two volumes" or "in many volumes." However, as is also readily apparent, Ferris' motion is based entirely on its utterly unsupported -- and manifestly baseless -- ipse dixit assumption that the term "Book" can only mean "in one volume." As will be discussed further below, the law is clear that Ferris' motion can only be granted if the Court finds, after considering and evaluating the proffered "extrinsic evidence," that as a matter of law Ferris' proffered "one volume" interpretation of the Agreement's defined term "Book" is the "only one reasonable" interpretation of that term. Hearst, 154 Wn.2d at 510.

We address first "compilation of the Work." It seems universally agreed that the word "compilation" necessarily encompasses – requires – more than one constituent part.[9] Put another way, it is semantically/linguistically impossible for a "compilation" to consist of only one constituent part. Thus, Ferris' proffered interpretation of the phrase "compilation of the Work" in the Agreement's defined term "Book"-- i.e., "singular" and consisting only of "the Work" -- is a contradiction-in-terms, an oxymoron, that utterly negates Ferris' "one volume" notion. Instead, the reference to "compilation of the Work" in the Agreement's definition of "Book" can best be understood as referring to two (or more) constituent parts – i.e., two or more volumes – derived from "the Work." At a minimum, for the purposes of the adjudication of Ferris' motion, that oxymoron necessarily supports – if not requires – the conclusion that there is more than one "reasonable" interpretation of the defined term "Book" -- e.g., "in

---

[9] Oxford Languages, a compendium published by Oxford University Press, provides two definitions of "compilation": "1. the action or process of producing something, especially a list, book, or report, by assembling information collected from other sources. . . . 2. a thing, especially a book, record, or broadcast program, that is put together by assembling previously separate items."

FANTAGRAPHICS' OPPOSITION TO FERRIS'  
MOTION FOR PARTIAL SUMMARY JUDGMENT - 7  
2:21-cv-00802-LK

*Endejan Law, LLC*  
*5109 23rd Ave, W.*  
*Everett, WA 98203*

two volumes" as distinct from "in one volume."

We turn now to the absurdity of Ferris' <u>ipse dixit</u> assumption that the defined term "Book" must necessarily and only mean "in one volume" and that the word "book" can never be understood to include more than one volume.

The Chicago Manual of Style, which is Fantagraphics' own style guide, contains a separate section instructing the proper form of citation for what it calls "Book with Volumes." Here's a slightly reduced excerpt from https://library.ship.edu/c.php?g=21703&p=127131:

**Book with Volumes**

(Chicago Manual of Style 14.121-14.127)

Author, Title (Place of publication: Publisher, Year of publication), Volume Number: Page number.

Full Example
1. David Levering Lewis, W.E.B. Dubois, 1919-1963: The Fight for Equality and the American Century (New York: H. Holt and Company, 1993), 2:15.

Abbreviated Example
2. Lewis, W.E.B. Dubois, 15.
Author. Title. Number of volumes. Place of publication: Publisher, Year of publication.

Example
Lewis, David Levering. W.E.B. Dubois, 1919-1963: The Fight for Equality and the American Century. 2 vols. New York: H. Holt and Company, 1993.

Further, the well-known website "Goodreads" has a separate section entitled "Multi Volume Books" which lists hundreds of books that the site offers to its visitors that consist of more than one volume.  (https://www.goodreads.com/shelf/show/multi-volume)  Included on that list is THE HISTORY OF THE DECLINE AND FALL OF THE ROMAN EMPIRE, by Edward Gibbon.  Here is Wikipedia's introduction to its article on that book:

FANTAGRAPHICS' OPPOSITION TO FERRIS'
MOTION FOR PARTIAL SUMMARY JUDGMENT - 8
2:21-cv-00802-LK

*Endejan Law, LLC*
*5109 23rd Ave, W.*
*Everett, WA 98203*

> The History of the Decline and Fall of the Roman Empire . . . is a six-volume work by the English historian Edward Gibbon. It traces Western civilization (as well as the Islamic and Mongolian conquests) from the height of the Roman Empire to the fall of Byzantium in the fifteenth century. Volume I was published in 1776 and went through six printings . . . Volumes II and III were published in 1781;. . . volumes IV, V, and VI in 1788–1789. . . .
>
> The six volumes cover the history, from 98 to 1590, of the Roman Empire, the history of early Christianity and then of the Roman State Church, and the history of Europe, and discusses the decline of the Roman Empire among other things.

Even if this inquiry -- whether the word "Book" can reasonably be interpreted as encompassing more than one volume -- were limited to the strict confines of this litigation, the following Interrogatories propounded by Ferris and Responses thereto by Fantagraphics conclusively establish that Ferris well knows the true interpretation even while she asks this Court to declare "as a matter of law" the exact opposite (emphasis added):

INTERROGATORY NO. 10:

IDENTIFY all other works, not authored by MS. FERRIS, that FANTAGRAPHICS has published in multiple volumes.

RESPONSE:

Fantagraphics reiterates and incorporates here generally its General Objections and in particular its General Objections 1, 3, 8, and 10. Since this action involves the publication by Fantagraphics of a single existing unitary work that was not previously published, <u>Fantagraphics interprets the term "other works" in this Interrogatory to refer to other single existing unitary works that were not previously published. (In contrast, Fantagraphics assumes this Interrogatory is not addressed to series of works, some of which are not in existence at the time of contract, or to reprints by Fantagraphics of previously published works, including comic strips.) Thus understood, Fantagraphics identifies the work entitled B. KRIGSTEIN as a single existing unitary work that was not previously published that Fantagraphics published in multiple volumes.</u>

INTERROGATORY NO. 11:

For all works identified in INTERROGATORY NO. 10, IDENTIFY whether the identified works were covered by a single publishing agreement or multiple publishing agreements.

FANTAGRAPHICS' OPPOSITION TO FERRIS'  
MOTION FOR PARTIAL SUMMARY JUDGMENT - 9  
2:21-cv-00802-LK

*Endejan Law, LLC*  
*5109 23rd Ave, W.*  
*Everett, WA 98203*

RESPONSE:

<u>The work entitled B. KRIGSTEIN was published in two volumes, the first in 2002, through a single publishing agreement</u>

Obviously, the word – the fact – of a "book" is not limited to one volume, and that word/fact can and often does encompass a "book" that is published in more than one volume. Thus, the <u>ipse dixit</u> and unexplained and unsupported assumption by Ferris that the word "book" necessarily and only means "in one volume" is, at least in the cultural/literary sense, illiterate; in the actual factual sense, contrary to what Ferris herself knows from Fantagraphics' responses to her own Interrogatories and from what she herself (though Bemiss) affirmatively proposed to Fantagraphics; and in the legal sense -- "as a matter of law" -- frivolous in the extreme. But, alas, that single utterly baseless <u>ipse dixit</u> assumption is the entire asserted predicate for Ferris' entire motion.

If supported by extrinsic evidence, in a given case "one volume" is certainly a possible interpretation of the term "Book." At the same time, if supported by extrinsic evidence, that defined term can just as readily apply to two or more volumes. And here, all the available extrinsic evidence -- including the previously mentioned "OK. EMIL SAYS SHE CAN HAVE VOLUME ONE READY BY DECEMBER 31ST. VOLUME TWO BY APRIL 31ST [sic]" and the statement in the Bemiss Announcement that the book (the Work) "will be published in 2 volumes" -- clearly supports, if not requires, an interpretation directly contrary to the one proffered by Ferris. And, as will be demonstrated in full below, that is all that is required for Ferris' motion to be denied at this time.

In sum, on its face, the defined term "Book" in the Agreement is at least as consistent with an interpretation that it applies to "two volumes" as it is to an interpretation that it neces-

FANTAGRAPHICS' OPPOSITION TO FERRIS'
MOTION FOR PARTIAL SUMMARY JUDGMENT - 10
2:21-cv-00802-LK

*Endejan Law, LLC*
*5109 23rd Ave, W.*
*Everett, WA 98203*

sarily and only applies to "one volume."  And every use of the term "Book" in the Agreement after its definition -- which uses must follow the interpretation of the defined term itself -- is similarly just as compatible with a "two volumes" meaning as a "one volume" one.  Nothing in the Agreement remotely supports Ferris' fantasy that "the only one" reasonable interpretation of the defined term "Book" in the Agreement is the "one volume" meaning she proffers.              Reinforcing that conclusion is the fact that all of the "subsidiary rights" granted to Fantagraphics in Paragraph 3 of Agreement -- which paragraph applies to "the Work" and not to "the Book" -- indisputably authorizes Fantagraphics to "license" the Work for publication by others in two or more volumes.  As a result, if Ferris' contention is credited, that means that while a foreign publisher could publish "the Work" in multiple volumes, Fantagraphics itself could not.  Of course, a cardinal rule of contract interpretation is that courts should strive to avoid such "absurd" results.[10]

**The Applicable Law**

Ferris' motion contends that <u>Hearst</u> supports her notion that extrinsic evidence is precluded in this case.   But exactly the opposite is true – <u>Hearst</u> effectively <u>requires</u> that such evidence be considered in interpreting the Agreement.

<u>Hearst</u> declared (at 154 Wn.2d at 503):

> Since Berg, we have explained that surrounding circumstances and other extrinsic evidence are to be used "to determine the meaning of specific words and terms used" and not to "show an intention independent of the instrument" or to "vary, contradict or modify the written word." [citations omitted] (court's intention in adopting the "context rule" was not "to allow such evidence to be employed to

---

[10] See, e.g., <u>Daniels v. State Farm Mutual Ins. Co.</u>, 4 Wn. App. 2d 268, 273 (Wa. Ap. 2018) "We also give the contract a practical and reasonable rather than a literal, strained, or forced interpretation that results in an absurd conclusion."

FANTAGRAPHICS' OPPOSITION TO FERRIS'  
MOTION FOR PARTIAL SUMMARY JUDGMENT - 11  
2:21-cv-00802-LK

Endejan Law, LLC  
5109 23rd Ave, W.  
Everett, WA 98203

emasculate the written expression of" the meaning of the contract's terms); [citation omitted] ("context rule" cannot be used to show intention independent of the instrument); [citation omitted] (admissible extrinsic evidence does not include evidence of a party's unilateral or subjective intent as to contract's meaning).

And then, just a few pages later (id. at 509), Hearst reiterated: "extrinsic evidence may be used only to determine the meaning of specific words in the agreement . . .," which is precisely the situation here, since Ferris' motion requires the Court to "determine the meaning" of the defined term "Book" -- or more accurately to determine if there is more than one reasonable interpretation of that term.  And if there is more than one such reasonable interpretation – i.e., "in two volumes" as well as "in one volume " -- Hearst requires that this motion be denied.

Since Hearst, numerous (probably hundreds if not thousands) decisions by Washington state courts and courts in this District have not only followed but expanded on that teaching from Hearst.  Believing doing so is unnecessary, we will resist burdening this Opposition with a litany of citations to and quotations from those cases.  Instead, we will only directly invoke and quote from the very recent (December 17, 2021) decision by this District's Judge Richard A. Jones in Fairhaven Health, LLC v. BioOrigyn, LLC, 2021 WL 5987, 2021 U.S. Dist. LEXIS 241794 W.D.WA 12/17/21), which decision clearly sets forth the law governing this motion:

> "[T]he touchstone of the interpretation of contracts is the intent of the parties." [Citation omitted]  "[A] court's primary goal is to ascertain the parties' intent at the time they executed the contract." [Citation omitted]  In interpreting contracts, Washington follows the "objective manifestation theory." [Citations omitted]  Under that theory, courts determine the parties' intent by focusing on an agreement's "objective manifestations," not the parties' "unexpressed subjective intent." [Citation omitted]  Courts determine intent by the "reasonable meaning of the words used" in an agreement. [Citation omitted]
>
> Washington also follows the "context rule." [Citation omitted]  Under that rule, "extrinsic evidence is admissible as to the entire circumstances under which the contract was made,  as an aid in ascertaining the parties' intent." [Citation

FANTAGRAPHICS' OPPOSITION TO FERRIS'  
MOTION FOR PARTIAL SUMMARY JUDGMENT - 12  
2:21-cv-00802-LK

*Endejan Law, LLC*  
*5109 23rd Ave, W.*  
*Everett, WA 98203*

> omitted] Such evidence is admissible regardless of whether the contract is ambiguous. [Citation omitted]  Extrinsic evidence, however, is to be used to "determine the meaning of specific words and terms used" and not to "show an intention independent of the instrument or to vary, contradict or modify the written word." [Citations omitted.]

2021 U.S. Dist. LEXIS 241794 at *23-*24 (emphasis added).

That opinion also set forth the law governing the adjudication of motions for summary judgment in the context presented here -- except that here the motion has been made with no relevant discovery having been conducted:

> "Contract interpretation is a question of fact when a court relies on inferences drawn from extrinsic evidence." [Citation omitted]   "[S]ummary judgment is inappropriate when more than one reasonable inference can be drawn from the extrinsic evidence." [Citations omitted] ("A question of interpretation . . . is to be determined by the trier of fact if it depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence.")

Id. at *33-*34 (emphasis added).  (See also, to the same effect, the September 20, 2021 opinion of Judge Barbara Jacobs Rothstein of this District in Whitman v. State Farm Insurance Company, Civil Action No. 3:19-cv-6025-BJR, 2021 U.S. Dist. LEXIS 179027 (W.D. Wa. 2021).)

Ferris' motion utterly misunderstands the teaching of Hearst.  That teaching has two separate components: The first component is that in cases of contract interpretation, "extrinsic evidence" may always be considered but "the subjective intent of the parties is generally irrelevant if the intent can be determined from the actual words used [citation omitted] [and] "[w]e generally give words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent. [citation omitted]." 154 Wn.2d at 504 (emphasis added).

The second equally important teaching of Hearst, as reiterated in such cases as Fair-

FANTAGRAPHICS' OPPOSITION TO FERRIS'
MOTION FOR PARTIAL SUMMARY JUDGMENT - 13
2:21-cv-00802-LK

*Endejan Law, LLC*
*5109 23rd Ave, W.*
*Everett, WA 98203*

haven and Whitman, cited above, is that "extrinsic evidence" is <u>always relevant</u> and <u>must be</u> considered "<u>to determine the meaning of specific words in the agreement</u>," <u>Id.</u> at 509 (emphasis added). And here, of course, the only issue to be adjudicated on this motion is the "<u>meaning</u>" -- only one volume, or two or more – of the defined term "Book" in the Agreement. In short, "extrinsic evidence" is absolutely essential for that adjudication. And, of course, to cite just one example of the "extrinsic evidence" now before the Court on this motion, the Bemiss Announcement (from Ferris' agent who negotiated it) explicitly proclaimed that the Agreement ("the deal") provides that the Work will be published by Fantagraphics "in 2 volumes."

**The Potential Extrinsic Evidence**

The Groth Declaration submitted herewith contains in almost every paragraph direct quotation from the writing of Ferris or Bemiss all squarely relevant to the central issue of the "meaning" of the defined term "Book" in the Agreement. Because Ferris has thus far not produced to Fantagraphics a single document in discovery, and insists on withholding admittedly responsive documents, those quotations are necessarily drawn from Fantagraphics' own set of emails between (primarily) it and Ferris and Bemiss.

Which means that to date Fantagraphics has not seen <u>any</u> emails between Ferris and her agent Bemiss, which (we posit) almost certainly will shed further light on Ferris' own actual understanding of the one volume/two volume interpretation of the term "Book" in the Agreement. Which also means that Fantagraphics has not seen a single communication between Ferris and the various third parties whose likenesses she offered to include in Book 2

FANTAGRAPHICS' OPPOSITION TO FERRIS'  
MOTION FOR PARTIAL SUMMARY JUDGMENT - 14  
2:21-cv-00802-LK

*Endejan Law, LLC*  
*5109 23rd Ave, W.*  
*Everett, WA 98203*

for the payment of money to her.[11]  We submit that those emails, if ever produced by Ferris, will almost certainly confirm Ferris' understanding that the very Book 2 in which she was selling inclusion was under contract with Fantagraphics. Which, we surmise, is precisely why Ferris has to date not produced a single document requested by Fantagraphics in discovery and insists on withholding directly responsive documents.

**Extrinsic Evidence on This Motion**

The unmistakable goal of Ferris' Hail Mary motion is to prevent the Court from even considering Fantagraphics' "extrinsic evidence."  At the same time, bizarrely, Ferris' motion is replete -- on almost every page -- with references to precisely such extrinsic evidence, even including her own (albeit preposterous) extrinsically proffered definition of the word "book." One might ask: What's going on here?  If Ferris truly believes "extrinsic evidence" is verboten on this motion, how can her own wholesale proffer of such evidence in support of her motion possibly be justified?  We think we have the answer: She apparently believes her "extrinsic evidence" is entirely appropriate for the Court to consider and that only Fantagraphics' (entirely contrary, and fully supported) extrinsic evidence cannot.  That doesn't seem fair.

Unlike most motions for Summary Judgment, which are expressly predicated on a claimed body of "undisputed" "material" "facts," Ferris' motion repeatedly asserts that no "facts" at all may be considered in the adjudication of the motion.  For that reason, it appears that Rule 56(c) and Local Civil Rule 56.1 have no application to the motion, which presumably explains the absence of any assertion by Ferris that her motion is in any way based on any "undisputed" "material" "facts."

---

[11] Ferris Counterclaims, Paragraph 25.

FANTAGRAPHICS' OPPOSITION TO FERRIS'  
MOTION FOR PARTIAL SUMMARY JUDGMENT - 15  
2:21-cv-00802-LK

*Endejan Law, LLC*  
*5109 23rd Ave, W.*  
*Everett, WA 98203*

But, as required by Hearst and the cases that followed it, this Court must consider such evidence to provide "meaning" to specific words in the Agreement, even if those words are claimed to be unambiguous. To facilitate that consideration, the Groth Declaration sets forth an under-oath rendition of some of the extrinsic evidence currently available to Fantagraphics. And, crucially, Hearst described the kind of extrinsic evidence this Court must consider on this motion, which the Groth Declaration follows exactly:

> In Berg, we recognized the difficulties associated with interpreting contracts solely on the basis of the "plain meaning" of the words in the document. We said that the process of interpretation involves "'one person giving a meaning to the symbols of expression used by another person.'" [Citations omitted] We recognized that the meaning of a writing "'can almost never be plain except in a context.'" [Citations omitted] We adopted the "context rule" and recognized that intent of the contracting parties cannot be interpreted without examining the context surrounding an instrument's execution. If relevant for determining mutual intent, extrinsic evidence may include (1) the subject matter and objective of the contract, (2) all the circumstances surrounding the making of the contract, (3) the subsequent acts and conduct of the parties, and (4) the reasonableness of respective interpretations urged by the parties. [Citations omitted] In Berg, we concluded that extrinsic evidence was admissible to aid in understanding the parties' intent with respect to the meaning of "gross rentals." [Citation omitted].

154 Wn.2d at 502 (emphasis added).

The relevant discovery background of this case is as follows: On August 24, 2021, Judge Coughenour issued a "Minute Order Setting Initial Case Management Dates." (Dkt 17) That Order set November 29, 2021 -- more than three months later -- as the "Deadline" by which the parties had to "meet and to provide the Court with a combined Joint Status Report." Fantagraphics immediately and repeatedly pressed Ferris' then attorneys for the soonest possible date for that conference. But Ferris' counsel insisted that that conference had to be conducted on November 29, 2021 -- the last possible date -- and not a day sooner. Thus, three full months during which the case could have moved forward productively were wasted solely

FANTAGRAPHICS' OPPOSITION TO FERRIS'
MOTION FOR PARTIAL SUMMARY JUDGMENT - 16
2:21-cv-00802-LK

*Endejan Law, LLC*
*5109 23rd Ave, W.*
*Everett, WA 98203*

because of Ferris' unilateral (and admitted) stalling strategy.[12]

The parties conferred on that last possible date and submitted their Joint Status Report on December 13, 2021 (Dkt 20). In that Report, Ferris' counsel set forth the fulsome scope of discovery they believed necessary in the case. (Dkt 20, p. 15, under "Targeted Discovery") The next day, December 14, 2021, Judge Coughenour issued his "Civil Trial Scheduling Order." (Dkt 21) After extensive negotiation, on January 24, 2022, the parties submitted their "Stipulated Protective Order." (Dkt. 23) This Court entered that Order the next day (Dkt 24)

That Protective Order (at its Paragraph 3) expressly acknowledged that Fantagraphics "agreed to enable and expedite a full immediate audit by KPMG of its records relating to the book that is the subject of this case." Fantagraphics fully complied with that agreement, providing to KPMG (and simultaneously to Ferris' then counsel as direct discovery) every document requested by KPMG, withholding none.

That discovery established, as Fantagraphics consistently maintained, and contrary to Ferris' repeated false accusations (including in her Counterclaims), that not only has Fantagraphics not "underpaid" royalties to Ferris, it actually overpaid her. As to the "audit" by KPMG, which company Ferris' then counsel called Ferris' "agent," those counsel unilaterally "suspended" the "audit" because (they explained) allowing the audit to proceed to completion was not in Ferris' "interest." (Recently, those counsel separately advised Fantagraphics' counsel that Ferris was "dropping" her counterclaims of "breach" against Fantagraphics, although there has to date been no formal indication of that action.)

---

[12] Ferris' counsel proclaimed their strategy with respect to how they intended to litigate the case in an email to Fantagraphics' counsel that is reprinted in the parties' Joint Status Report, Dkt 20, p. 20, under "Trial Date."

FANTAGRAPHICS' OPPOSITION TO FERRIS'
MOTION FOR PARTIAL SUMMARY JUDGMENT - 17
2:21-cv-00802-LK

Endejan Law, LLC
5109 23rd Ave, W.
Everett, WA 98203

As a result, it is now established that Fantagraphics has provided to Ferris full discovery of its relevant financial documents and it has also responded fully to Ferris' Interrogatories.  In contrast, post-Joint Status Report, Ferris' prior counsel drastically reversed their prior position concerning the full extent of document production needed in this case and insisted that they will withhold from production extensive (but not fully identified) otherwise concededly discoverable documents.  In this connection, those counsel flatly refused Fantagraphics' proposal that each side agree to produce all discoverable documents, affirmatively withholding none.  Those counsel also refused to agree that Fantagraphics' duly-noticed deposition of Ferris could proceed as noticed.  Thus, to date, Ferris has not yet provided any discovery and both sides have agreed that court intervention with respect to several discovery issues will be needed.

Beginning in about April of this year, the parties agreed that, if attainable, a "settlement" resolving all claims (and generating Book 2 to Fantagraphics) would be preferable to continued litigation.  For that reason, they turned their full attention to a possible "settlement," agreeing to jointly request appropriate extensions of Court deadlines if necessary.  And the parties made heroic -- seemingly full-time -- efforts towards that goal, but by June Fantagraphics realized that no settlement would be possible.  Fantagraphics then repeatedly attempted to refocus Ferris' then attorneys' attention to discovery.  Whether or not directly attributable to Fantagraphics' pressing for an immediate resumption of discovery, Ferris' prior counsel suddenly withdrew from the case.  Ferris' instant motion, by new counsel  – which motion is plainly designed to thwart discovery -- followed immediately.

The Groth Declaration submitted herewith sets forth dozens of direct quotes from Ferris and Bemiss (and others) that shed direct dispositive light on Ferris' own understanding

FANTAGRAPHICS' OPPOSITION TO FERRIS'  
MOTION FOR PARTIAL SUMMARY JUDGMENT - 18  
2:21-cv-00802-LK

*Endejan Law, LLC*  
*5109 23rd Ave, W.*  
*Everett, WA 98203*

of the one volume/two volume interpretation -- meaning -- of "Book" in the Agreement.

Except for the (perhaps excessive) presentation in this Opposition of a few extracts from Fantagraphics' currently available "extrinsic evidence" applicable to whether "one volume" is the "only one reasonable" "meaning" of the term "Book" in the Agreement, we do not believe it is necessary to further burden this Opposition with a recounting of all that evidence. Instead, we respectfully refer the Court to the full Groth Declaration for all that evidence, adding only this observation: Ferris' own under-oath Declaration -- her submission of her proffered "extrinsic evidence" -- consists solely of her own bald assertions, utterly unsupported by a single reference to any other evidence. It will be for the Court to assess the viability of Ferris' assertions when compared with the contents of the Groth Declaration, which contains numerous direct quotes from Ferris that squarely contradict her bald assertions in her Declaration.

**Conclusion**

The sole mission of Ferris' motion is to persuade the Court that the defined term "Book" in the Agreement has only one reasonable meaning: that it can only be understood to refer to a "single volume." In deciding that issue, the Court must consider all the proffered extrinsic evidence, including Ferris' and Bemiss' numerous acknowledgments that Ferris "owed" to Fantagraphics what they both called "Book 2" and their numerous excuses, apologies and promises in addressing Ferris' repeated failure to comply with that obligation. If, as we believe inevitable, the Court decides that Ferris has not accomplished her "one volume" mission, and that at a minimum the term "Book" in the Agreement can have more than one "meaning," this motion must be denied.

Wholly dependent on a manifestly baseless and utterly unexplained *ipse dixit* assumption that the defined term "Book" in the Agreement can only mean "in one volume,"

FANTAGRAPHICS' OPPOSITION TO FERRIS'
MOTION FOR PARTIAL SUMMARY JUDGMENT - 19
2:21-cv-00802-LK

*Endejan Law, LLC*
*5109 23rd Ave, W.*
*Everett, WA 98203*

Ferris' motion seeks to have this Court enter a formal judgment declaring an interpretation of the Agreement that we believe she well knows is empirically factually false. Leaving for another day further proceedings, Fantagraphics here only requests that Ferris' motion be denied.

Dated: July 22, 2022

    Respectfully submitted,

    s/ Kenneth P. Norwick
    *Pro Hac Vice*
    NORWICK & SCHAD
    110 E 59th Street
    New York, NY 10022
    212-751-4440
    Email: ken@norwickschad.com

    Judith A Endejan
    ENDEJAN LAW LLC
    5109 23rd Avenue W.
    Everett, Wa 98203
    206-799-4843
    Email: jendejan@gmail.com

    Attorneys for Plaintiff
       Fantagraphics Books, Inc.

FANTAGRAPHICS' OPPOSITION TO FERRIS'
MOTION FOR PARTIAL SUMMARY JUDGMENT - 20
2:21-cv-00802-LK

*Endejan Law, LLC*
*5109 23rd Ave, W.*
*Everett, WA 98203*