UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| FANTAGRAPHICS BOOKS, INC., <br><br> Plaintiff, <br><br> v. <br><br> EMIL FERRIS, <br><br> Defendant. | CASE NO. C21-00802-LK <br><br> ORDER DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT |

This matter comes before the Court on Emil Ferris's motion for partial summary judgment. Dkt. No. 33. Fantagraphics Books, Inc., a Seattle-based publisher, published Ferris's book entitled *My Favorite Thing Is Monsters* in 2017. Dkt. No. 2 at 1. The parties dispute whether Fantagraphics is entitled to publish "Book 2" of *Monsters* under the parties' 2016 publishing agreement. They have filed competing claims for declaratory relief on that issue, and Ferris seeks partial summary judgment dismissing Fantagraphics' claim for a declaratory judgment that it is entitled to publish Book 2 of Monsters and granting Ferris's counterclaim for a declaratory judgment that Fantagraphics does not have the right to publish anything other than the *Monsters* book it has already published. For the reasons set forth below, the Court denies the motion.

ORDER DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT - 1

I.   BACKGROUND

**A.   Fantagraphics and Ferris Agree to Publish *Monsters***

In 2012, Ferris, a formally trained artist and novelist, began working on what would become *Monsters*. Dkt. No. 34 at 2. The graphic novel tells the story of Karen, a 10-year-old girl who grew up in Chicago in the 1960s. *Id.* Ferris writes and illustrates everything the reader sees on the page, including the writing, art, color, and lettering, so her work on the manuscript was time-consuming. *Id.* In 2015, Ferris finished a 600+ page manuscript for *Monsters*, and though she knew it would require additional editing, she engaged literary agent Holly Bemiss to shop the manuscript to potential publishers. *Id.* Fantagraphics, an independent Seattle-based book publishing company, expressed interest in publishing *Monsters*. *Id.*

During negotiations, Gary Groth, the president of Fantagraphics, indicated that the 600+ page manuscript was too long to be commercially marketable. Dkt. No. 34 at 3. Fantagraphics contends that the parties agreed that Fantagraphics would publish *Monsters* in two volumes because of its length. Dkt. No. 36 at 3.[1] For her part, Ferris asserts that the parties discussed but never reached agreement on the terms for publishing the second installment of the story. Dkt. No. 34 at 3. Ferris agreed to edit the manuscript down to approximately 400 pages, which left approximately 230 pages that she refers to as the "remnant." *Id.* Ferris contends that she "never intended to use the remnant as the principal source for the next installment of Monsters, which [she] started working on before the first book was published." *Id.* As part of Ferris's process of editing down *Monsters*, she created a set of new pages that presented a different ending than the one in the manuscript. *Id.* According to Ferris, the "new ending is not in any way in alignment with the remnant, so publishing the remnant as the next installment of the story won't make any

---

[1] The parties' dispute over the admissibility of the alleged communications regarding this issue is addressed below.

sense and will be confusing to readers." *Id.* Ferris contends that once Book 1 was created, the remnant "was no longer usable as the basis for the next work in the series," *id.* at 6, and she told Groth that only 30–50 pages of the remnant "could possibly be used" for the next book, *id.* at 3.

The parties entered into a publishing agreement in January 2016. Dkt. No. 15-1. The agreement grants Fantagraphics exclusive rights to, among other things, "[p]rint, publish, and sell the Work in hard cover and soft cover book form," "[p]rovide electronic and digital versions of the book," and "[l]icense publication of the Work"—including "selections from the Work in anthologies and other publications, in mail-order and schoolbook editions; or as premiums and other special editions." *Id.* at 2. The agreement does not define the term "Work." However, it defines "Book" as "a compilation of the Work in book form currently titled *My Favorite Thing Is Monsters*." *Id.* It further contains a reservation of rights providing that "[a]ll rights (TV/movie/dramatic/multimedia/merchandising) not included in this contract belong to the Author." *Id.* at 4. The agreement's integration clause states that it "contains the entire understanding of the parties with respect to its subject matter," and that "[a]ny and all representations or agreements by any agent or representative of either party to the contrary shall be of no effect." *Id.* at 6. Furthermore, any "waiver or modification of any of the terms of th[e] Agreement" is required to be "in writing, signed by both parties." *Id.*

Ferris agreed to deliver the "Work to be included in the Book" to Fantagraphics "according to a mutually agreed upon schedule," and Fantagraphics agreed to "publish the Work within 24 months of the date of th[e] Agreement." *Id.* at 4. Ferris also authorized and appointed Bemiss to act as her agent under the terms of the agreement. *Id.* at 5; *see also* Dkt. No. 15 at 3. Bemiss sent Groth a draft announcement for his approval to publicize the agreement and upcoming publication. Dkt. No. 36 at 4; *see also* Dkt. No. 2 at 3; Dkt. No. 15 at 4. The draft announcement, which was subsequently printed in relevant part in the trade publication *Publishers' Marketplace*, stated that

the book would be "published in 2 volumes." Dkt. No. 36 at 4; *see also* Dkt. No. 2 at 3; Dkt. No. 15 at 4.

*Monsters* Book 1 was published in February 2017. Dkt. No. 34 at 4. Fantagraphics published it with the words "Book One" prominently written on the title page and spine. Dkt. No. 36 at 6; *see also* Dkt. No. 15 at 5. With the agreement in place, Fantagraphics began granting licenses to foreign publishers to publish both volumes. Dkt. No. 36 at 4. According to Fantagraphics, the licenses specified the separate publication of Book 1 and Book 2, and Fantagraphics received separate advance payments for each volume. *Id.* at 4–5. Fantagraphics sent Ferris copies of the licenses and her contractual share of the advance payments, including those specifically attributable to Book 2, without objection from Ferris. *Id.* at 5.

**B.    Publication of Book 2 Is Repeatedly Delayed**

According to Fantagraphics, the parties and Bemiss agreed that Book 2 would be published in July 2017. Dkt. No. 36 at 5. Ferris advised Fantagraphics that she wanted to "polish" the second part of *Monsters* before it was published, promising that she would deliver her polished version to Fantagraphics in time to meet the publication date. *Id.*; *see also* Dkt. No. 15 at 6. Fantagraphics announced the July 2017 publication date in its catalogue, and asserts that it did so with the "full knowledge and enthusiastic support" of Bemiss and Ferris. Dkt. No. 36 at 5; *cf.* Dkt. No. 15 at 5. Ferris created a front cover for Book 2 in collaboration with Fantagraphics' designer, and Fantagraphics alleges that she agreed that it could be included with the announcement for Book 2. Dkt. No. 36 at 5. Ferris and Groth agreed that Ferris would need to write pages for Book 2 that would represent a transition from Book 1 to Book 2, and Ferris sent the new transition pages to Groth in May 2017. *Id.* at 13; *see also* Dkt. No. 19-1 at 9; Dkt. No. 15 at 8.

Despite the parties' initial cooperation, difficulties ensued in bringing Book 2 to market. Ferris claims that Fantagraphics "pressured" her to meet several deadlines to finish the next

ORDER DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT - 4

installment, but she was unable to meet those deadlines because Fantagraphics was "insisting" that she travel to promote Book 1. Dkt. No. 34 at 4. Regardless of the reasons, Ferris did not meet her deadline, and the parties agreed to reschedule the publication of Book 2 to October 2017. Dkt. No. 36 at 6. Ferris failed to meet the deadline again, and the parties agreed that Book 2 would be published in April 2018. *Id.* at 7. Each time, Fantagraphics announced the new publication dates in its catalogue with Ferris's and Bemiss's "full knowledge and support," featuring the Book 2 front cover and other content Ferris created for the announcement. *Id.* at 6–7. Ferris again failed to meet the deadline for the April 2018 publication. *Id.* at 7.

While awaiting the publication of Book 2, the parties agreed to create and publish a "one shot" 32-page comic book to help promote both Books 1 and 2 of *Monsters*. *Id.* at 15. Fantagraphics asserts that Ferris approved that publication. *Id.*

By the time Ferris missed her deadline to meet the April 2018 publication, Fantagraphics had publicly announced a publication date for Book 2 in three separate catalogues and created marketing materials and prepared for publication three separate times. *Id.* at 7. At that point, and without a draft of Book 2, Fantagraphics told Ferris it could not risk further damaging its relationship with its distributor, retailers, and the publishing industry by announcing a publication date for Book 2 unless and until Ferris actually delivered it. *Id.* To date, Ferris has not delivered Book 2 to Fantagraphics. *Id.* at 8.

C.  **Fantagraphics Sues and Ferris Counterclaims**

In June 2021, Fantagraphics filed a lawsuit in this Court, seeking a declaratory judgment that it is entitled to publish Book 2 of Monsters. Dkt. No. 2. Ferris counterclaimed for breach of contract for failure to pay her according to the terms of the publishing agreement, breach of the covenant of good faith and fair dealing, and for a declaratory judgment that the publishing agreement covers only Book 1 and does not grant Fantagraphics the right to publish "any of the

1 remnants from the Book 1 manuscript." Dkt. No. 15 at 13–31.

## II. DISCUSSION

A. **Jurisdiction**

Because the parties' filings were vague and potentially contradictory regarding the Court's subject matter jurisdiction, the Court requested supplemental briefing on that issue. Dkt. No. 41. In response, the parties asserted that the amount-in-controversy requirement is met under the Ninth Circuit's "legal certainty" test. Dkt. No. 42 at 4–5, 9–10. Under that test, "the sum claimed by the plaintiff controls if the claim is apparently made in good faith," and dismissal is not warranted unless it "appear[s] to a legal certainty that the claim is really for less than the jurisdictional amount[.]" *Naffe v. Frey*, 789 F.3d 1030, 1040 (9th Cir. 2015) (quoting *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288–89 (1938)). Where "the complaint affirmatively alleges that the amount in controversy exceeds the jurisdictional threshold," a "more searching inquiry is inapplicable." *Id.* at 1040.

Here, none of the pleadings alleges an amount in controversy or sufficient information from which the Court could infer that amount, *see* Dkt. Nos. 2, 15, 19-1, even though the amount in controversy is normally determined from the face of the pleadings. *Pachinger v. MGM Grand Hotel-Las Vegas, Inc.*, 802 F.2d 362, 363 (9th Cir. 1986); *Flores v. Safeway, Inc.*, C19-0825-JCC, 2019 WL 4849488, at *3 (W.D. Wash. Oct. 1, 2019). However, in the parties' supplemental brief, Fantagraphics states that the loss of the value of the right to publish Book 2 of Monsters "would far exceed $75,000," Dkt. No. 42 at 4, and Ferris alleges that the amount in controversy in each of her three counterclaims "exceeds the $75,000 minimum amount set forth in 28 U.S.C. § 1332(a)," *id.* at 7–8.

The Court can consider statements of parties and their attorneys in determining the amount in controversy. *See, e.g.*, *Singer v. State Farm Mut. Auto. Ins. Co.*, 116 F.3d 373, 376 (9th Cir.

1997) (holding that the district court reasonably exercised its discretion to accept "a formal judicial admission made in open court by the plaintiff's attorney, that the amount in controversy exceeds $50,000"); *Flores*, 2019 WL 4849488, at *4 (because attorneys act as their clients' agents, courts have "routinely found statements by attorneys to be relevant evidence of the amount in controversy."). The Court exercises its discretion to accept the parties' statements about the jurisdictional amount in their supplemental briefing because those statements are made by their counsel in a signed filing, Dkt. No. 42, and because their estimates appear reasonable given the other evidence in the record, including evidence that the first book "generated for Ferris more than $450,000 in royalties and other income and concomitant profits to Fantagraphics." Dkt. No. 2 at 1; *see also* Dkt. No. 15 at 3 (alleging that Ferris was entitled to more in royalties than she received for the first book); Dkt. No. 42 at 8 (stating that the value of the second book "far exceeds $75,000").

Accordingly, the parties are diverse and the amount in controversy requirement is met. Furthermore, the Court finds that the parties' claims for declaratory judgment present a "case of actual controversy" warranting the Court's exercise of discretionary jurisdiction under the Declaratory Judgment Act. 28 U.S.C. § 2201; *see also Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273 (1941) (declaratory judgment actions are justiciable if "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."). This Court has jurisdiction over the parties' claims and counterclaims based on 28 U.S.C. § 1332(a).

**B.      Summary Judgment Standard**

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court does not make credibility determinations or weigh the evidence at this

stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The sole inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. And to the extent that the Court resolves factual issues in favor of the nonmoving party, this is true "only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

The Court will, however, enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party has carried its burden under Rule 56(c), "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis omitted). Metaphysical doubt is insufficient, *id.* at 586, as are conclusory, non-specific affidavits, *Lujan*, 497 U.S. at 888–89.

**C.    The Scope of the Record**

Ferris requests that the Court strike the declaration of Gary Groth submitted in support of Fantagraphics' response because it does not substantially comply with 28 U.S.C. § 1746, violates the parol evidence rule, does not authenticate the documents on which it relies, and is "filled with hearsay." Dkt. No. 38 at 8–12. Because the Court "may only consider admissible evidence when reviewing a motion for summary judgment," it addresses these evidentiary issues first. *Weil v. Citizens Telecom Servs. Co., LLC*, 922 F.3d 993, 998 (9th Cir. 2019).

   1. <u>Section 1746</u>

To be admissible, declarations must "substantially" include the following language: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on (date)." 28 U.S.C. § 1746(2); *see also Commodity Futures Trading Comm'n v. Topworth Int'l, Ltd.*, 205 F.3d 1107, 1112 (9th Cir. 1999) (Section 1746 "requires only that the declaration 'substantially' comply with the statute's suggested language"). The purpose of this affirmation is to be certain that "the declarant understands the legal significance of the declarant's statements and the potential for punishment if the declarant lies." *United States v. Bueno-Vargas*, 383 F.3d 1104, 1111 (9th Cir. 2004). Groth's declaration substantially complies with Section 1746 as follows:

- The beginning of the declaration states that he "declares under penalty of perjury as follows[.]"
- In a subsequent paragraph, Groth states that he is "personally swearing to the truth" of the facts in the declaration "under oath and under penalty of perjury, all based on my own personal knowledge."

Dkt. No. 36 at 2; *see also* Dkt. No. 37 (corrected signature page with proper signature and date of declaration). While not in an ideal format, those elements meet the requirements of the statute and demonstrate that Groth understands the legal significance of his statements and the consequences of lying.

    2.    <u>Hearsay</u>

However, certain statements in Groth's declaration cannot be considered in resolving Ferris's motion. Although Groth confirms that the statements in his declaration are based on personal knowledge, Dkt. No. 36 at 2, he occasionally uses plural pronouns to describe what "we" were aware of, *see, e.g., id.* at 17–18. Because Groth may only testify about his own personal knowledge, the Court does not consider assertions in his declaration regarding what others knew. Fed. R. Civ. P. 56(c)(4); Fed. R. Evid. 602.

### 3. Unauthenticated materials

Ferris also argues that portions of the Groth declaration in which he fails to attach or authenticate communications or documents from which he quotes are inadmissible. Dkt. No. 38 at 11–12. That argument has merit.

Even if the emails are not hearsay as party admissions under Federal Rule of Evidence 801(d)(2), Groth's recitations are not the best evidence of their contents. Under the best evidence rule, "[a]n original writing, recording, or photograph is required in order to prove its content" unless a Rule of Evidence or a federal statute provides otherwise. Fed. R. Evid. 1002. Here, no applicable rule or statute would permit Groth's recitations to be admitted: none of the exceptions in Federal Rule of Evidence 1004 apply, nor does Rule 1007 provide an avenue for admission. *See* Fed. R. Evid. 1004 (describing circumstances where "[a]n original is not required and other evidence of the content of a writing, recording, or photograph is admissible"; Fed. R. Evid. 1007; *see, e.g.*, *Wiesner v. FBI*, 668 F. Supp. 2d 157, 160 (D.D.C. 2009) ("Rule 1007 is inapposite to the situation here because the plaintiff is not seeking to admit secondary evidence to prove the contents of a writing, recording, or photograph."). Rule 1002 therefore prevents Groth's attempt to "prove the content" of emails without attaching them. *Marceau v. Dep't of Ins.*, No. 1:09-CV-00514-N-EJL, 2011 WL 3439178, at *6 (D. Idaho Aug. 5, 2011) ("If testimony attempts to prove the contents of the document, such testimony is not admissible unless the original document is provided or [there is] an indication the original is lost."); *see also Interactive Educ. Concepts, Inc. v. TCDL Tex., Inc.*, No. 18-cv-7379-RSWL (Ex), 2019 WL 134540, at *3 (C.D. Cal. Jan. 8, 2019); *Sutton v. Derosia*, No. 1:11-cv-01426-LJO-JLT, 2012 WL 4863788, at *11 (C.D. Cal. Oct. 12, 2012); *Medina v. Multaler, Inc.*, 547 F. Supp. 2d 1099, 1122 (C.D. Cal. 2007). Because Groth's excerpted quotations, Dkt. No. 36 at 3–4, 6, 8–18, are not the best evidence, the Court does not

consider them to prove the contents of emails between him and Ferris or Bemiss.[2]

After Ferris filed her reply and requested that the Court strike the Groth declaration, Fantagraphics filed a surreply. Dkt. No. 40. Because Fantagraphics' surreply is not limited to "addressing the request to strike," and instead substantively responds to Ferris's reply, the Court does not consider it. *See* LCR 7(g); *see also, e.g.*, Dkt. No. 40 at 3 ("Ferris does not even try to refute Fantagraphics' contention, leaving the contention entirely undisputed.").

### 4. Parol Evidence Rule

Under the parol evidence rule, extrinsic evidence is not admissible to add to the terms of a fully integrated contract. *Hulbert v. Port of Everett*, 245 P.3d 779, 784 (Wash. Ct. App. 2011). Ferris argues that the Groth declaration is inadmissible under the parol evidence rule because it seeks to add to or vary the contract's terms. Dkt. No. 38 at 8–9. As set forth below, extrinsic evidence can provide context to help determine the meaning of specific words and terms used, so the Court considers the admissible portions of the Groth declaration for that purpose and not to alter the terms of the agreement. *See Hearst Commc'ns, Inc. v. Seattle Times Co.*, 115 P.3d 262, 267 (Wash. 2005).

### D.   Ferris Is Not Entitled to Partial Summary Judgment

Ferris argues that she is entitled to partial summary judgment that Fantagraphics does not have the right to publish Book 2 of *Monsters* because the publishing agreement is fully integrated and unambiguous, does not refer to a second volume, uses the words "Book" and "Work" in

---

[2] To the extent Ferris challenges the admissibility of the announcement written by Bemiss and published in Publishers' Marketplace stating that the book would be "published in 2 volumes," Dkt. No. 36 at 4, her argument is unavailing. Ferris admitted in her answer to the complaint that the announcement "speaks for itself." Dkt. No. 15 at 4. And because Groth's declaration reproduced the statement as a duplicate, its inclusion does not violate the best evidence rule. Dkt. No. 36 at 4; *see also* Dkt. No. 2 at 3; Dkt. No. 15 at 4; Fed. R. Evid. 1001(e), 1003. In addition, Groth has personal knowledge of the statement, and because it was made by Bemiss acting within the scope of her authority as Ferris's literary agent, it is not hearsay. Dkt. No. 36 at 4; Dkt. No. 15-1 at 5; Fed. R. Evid. 801(d)(2)(D). Accordingly, the Court considers the announcement.

1   singular form, and grants Fantagraphics only the right to publish Book 1 of *Monsters*. Dkt. No. 33

2   at 2. Fantagraphics disagrees, arguing that the parties instead agreed that Fantagraphics would

3   publish *Monsters* in two volumes, and that the language of the agreement and extrinsic evidence

4   supports this interpretation. Dkt. No. 35 at 2–11. For the reasons laid out below, Fantagraphics has

5   the better of the arguments.

6         The publishing agreement is governed by Washington law. Dkt. No. 15-1 at 6. Washington

7   follows the "objective manifestation theory" of contract interpretation, focusing "on the objective

8   manifestations of the agreement, rather than on the unexpressed subjective intent of the parties."

9   *Hearst Commc'ns, Inc.*, 115 P.3d at 267. Washington courts thus "impute an intention

10  corresponding to the reasonable meaning of the words used" based on the words' "ordinary, usual,

11  and popular meaning" unless "the entirety of the agreement clearly demonstrates a contrary

12  intent." *Id.* Accordingly, "the subjective intent of the parties is generally irrelevant if the intent can

13  be determined from the actual words used." *Id.* If relevant for determining mutual intent,

14  Washington courts allow extrinsic evidence "'to determine the meaning of *specific words and*

15  *terms used*' and not to 'show an intention independent of the instrument' or to 'vary, contradict or

16  modify the written word.'" *Id.* (emphasis added in *Hearst*) (quoting *Hollis v. Garwall*, Inc., 974

17  P.2d 836, 842 (Wash. 1999)). Extrinsic evidence includes the subject matter and objective of the

18  contract, all the circumstances surrounding the making of the contract, the subsequent acts and

19  conduct of the parties, and the reasonableness of the respective interpretations urged by the parties.

20  *Berg v. Hudesman*, 801 P.2d 222, 229 (Wash. 1990).

21        Ferris argues that it is undisputed that the contract is unambiguous, and that extrinsic

22  evidence cannot be used to interpret an unambiguous contract. Dkt. No. 33 at 2, 10–14. However,

23  an issue of fact exists regarding whether the parties intended the "Book" or "Work" to encompass

24  only *Monsters* Book 1 or *Monsters* published in two volumes. The publishing agreement grants

Fantagraphics the right to publish the "Work," Dkt. No. 15-1 at 2, but the agreement does not define "Work," and does not specify whether the Work will be published in one or multiple volumes. *See generally* Dkt. No. 15-1.[3] The agreement does, however, define "Book": "a compilation of the Work in book form currently titled *My Favorite Thing Is Monsters*." Dkt. No. 15-1 at 2. In common parlance, "compilation" means "the act or process of compiling" and "something compiled"—i.e., "gathered together especially from various sources." *Compilation*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/compilation (last visited Sept. 8, 2022); *Compiled*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/compiled (last visited Sept. 8, 2022).[4] This definition does not unambiguously indicate that the meaning of "Book" or "Work" in the agreement could include only one volume, as Ferris urges; instead, it suggests that "Book" or "Work" could comprise two volumes. Indeed, Fantagraphics argues—and Ferris does not dispute—that a book can be published in more than one volume. *See* Dkt. No. 35 at 8–10.

Because the Court finds that the terms "Book" and "Work" as used in the agreement are ambiguous, the Court considers extrinsic evidence to help determine the meaning of the terms. *See Hearst Commc'ns, Inc.*, 115 P.3d at 267. Fantagraphics' argument that the parties understood "Work" and "Book" to encompass two volumes finds support in the parties' words and actions relating to their execution of the publishing agreement.

---

[3] The agreement lacks much of the detail contained in typical publishing agreements. *See, e.g., Book Publishing Agreement (Trade Books)*, Practical Law Standard Document w-005-1382; *Ward v. Barnes & Noble, Inc.*, No. C13-7851-JMF, Dkt. No. 21-11 (S.D.N.Y. 2015); *Baker v. Weber*, No. C19-1093-JPC-GWG, Dkt. No. 142-1 (S.D.N.Y. May 9, 2022); *Curtis v. Illumination Arts, Inc.*, No. C12-991-JLR, Dkt. No. 24 at 18–45 (W.D. Wash. 2013); *Keiler v. Harlequin Enterprises Ltd.*, No. C12-5558-HB, Dkt. Nos. 13-1–13-3 (S.D.N.Y. Oct. 19, 2012).

[4] Similarly, in copyright law, a "compilation" is a "work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship," and includes collective works—works "in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole." 17 U.S.C.A. § 101.

Viewing the evidence in the light most favorable to Fantagraphics as the nonmoving party, the parties' actions are consistent with an understanding that the agreement bound Ferris to deliver both volumes of *Monsters* to Fantagraphics, and that it gave Fantagraphics the right to publish both volumes. Most significantly, Bemiss (acting as Ferris's agent) confirmed in a March 3, 2016 publicity announcement that the book would be "published in 2 volumes." Dkt. No. 36 at 4. This confirmation occurred shortly after the parties executed the publishing agreement in January 2016, Dkt. No. 15-1 at 2, and supports Fantagraphics' contention that the parties intended "Work" and "Book" to include two volumes. In addition, Fantagraphics' announcements regarding the publication dates of Book 2—and Ferris's approval of those announcements—supports an understanding that the agreement required her to deliver both volumes in accordance with the agreed publication timeline. *See* Dkt. No. 15-1 at 4; Dkt. No. 36 at 5–7. Finally, when a University of Nevada publication asked Ferris for permission to publish excerpts of Book 2, Ferris sent the publication's proposed contract to Fantagraphics for approval, indicating that she understood that Fantagraphics was the publisher for Book 2. Dkt. No. 36 at 14. A reasonable trier of fact could find that the terms "Work" and "Book" and subsequent references to them in the agreement are compatible with a book published in multiple volumes, as Fantagraphics contends.

Based on the evidence currently in the record, the Court finds that a reasonable juror could conclude either that the agreement provided Fantagraphics the right to publish both volumes of *Monsters*, or that it provided Fantagraphics the right to publish only Book 1. Because the agreement is not "subject to only one reasonable interpretation" as a matter of law, summary judgment is unwarranted. *Hearst*, 115 P.3d at 263; *see also Fairhaven Health, LLC v. BioOrigyn, LLC*, No. C19-01860-RAJ, 2021 WL 5987023, at *13 (W.D. Wash. Dec. 17, 2021) (summary judgment inappropriate where the extrinsic evidence left the Court with "two reasonable inferences"); *Phytelligence, Inc. v. Washington State Univ.*, No. C18-405-RSM, 2019 WL

2491911, at *5 (W.D. Wash. June 14, 2019) ("When the Court relies on inferences drawn from extrinsic evidence, contract interpretation is a question of fact."); *accord Wm. Dickson Co. v. Pierce Cnty.*, 116 P.3d 409, 413 (Wash. Ct. App. 2005) ("summary judgment is proper if the written contract, viewed in light of the parties' objective manifestations, has only one reasonable meaning.").

### III.   CONCLUSION

For the foregoing reasons, the Court DENIES Ferris's motion for partial summary judgment on the parties' competing declaratory judgment claims. Dkt. No. 33.

Dated this 9th day of September.

*Lauren King*
Lauren King
United States District Judge

ORDER DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT - 15